Kimberly W. BLAND, Plaintiff,

v.

MADISON COUNTY, FLORIDA,
Defendant.

No. TCA 93–40332–WS.

United States District Court,
N.D. Florida,
Tallahassee Division.

April 19, 1995.

Patricia A. Renovitch, Oertel, Hoffman, Fernandez & Cole, Tallahassee, FL, for Kimberly W. Bland.

D. Lloyd Monroe, IV, Cooper, Coppins & Monroe, Tallahassee, FL, David Switalski, Cooper, Coppins & Monroe, Tallahassee, FL, for Madison County.

## ORDER GRANTING SUMMARY JUDGMENT

STAFFORD, District Judge.

Before the court are defendant Madison County Florida's ("the County") motion for summary judgment (document 54) and plaintiff's response thereto (document 57). The County has also filed a supplemental memorandum of law (document 73) to which plaintiff has replied (document 74).

In her complaint, plaintiff alleges the County violated her rights to procedural due process, substantive due process, and freedom of speech when she was suspended and then discharged from her job as an Emergency Medical Technician. The County moves for summary judgment on all three counts of the complaint.

### I. *Facts:*

In the fall of 1991, plaintiff was hired by the County as a part-time Emergency Medical Technician ("EMT"). Document 2, ¶ 4. On April 21, 1992, plaintiff's employment was upgraded to a full-time EMT. During the period after plaintiff was hired on a full-time basis, April 21, 1992, through January 28, 1993, plaintiff was informally spoken to, disciplined and reprimanded by her immediate supervisor, EMS Director Juan Botino ("Botino"), three times. The first incident involved a fellow worker's comment to Director Botino concerning plaintiff returning an am-

bulance after her shift with a near empty tank. Document 54, plaintiff's deposition at 86–87. In response to the incident, Director Botino, in passing, mentioned to plaintiff that she "should fill the tank or have the assigned first responder fill it." Document 57, attachment 1 at 3. The second incident involved a local newspaper reporter, Robbie Burnett ["Burnett"], complaint to Botino concerning a comment that plaintiff had made regarding whether people in Greenville, Florida, could read.[1] In response to the complaint, Botino issued plaintiff a report of employee counseling and record of verbal warning. Document 55, exhibit F.[2] The third incident involved plaintiff smoking a cigarette at an accident scene. Document 55, composite exhibit G. In response to this incident, plaintiff was given a record of verbal warning in which plaintiff was advised by Botino that the above conduct was unprofessional and that he, Botino, was aware that most of plaintiff's co-workers did not want to work with her.[3] *Id.* Botino also informed plaintiff that he was extending her probationary status by 6 months. Document 55, composite exhibit G.[4]

On January 28, 1993, plaintiff was on duty when she received a dispatch to respond to an emergency call. Plaintiff, along with a first responder, was to meet the Madison ambulance Unit at a gasoline station located at Interstate 10 and State Road 221 to take a patient to Tallahassee. Upon picking up the first responder Doris Boothe ("Boothe") at her service station, plaintiff pulled out of the same on to U.S. 90 and proceeded to the gasoline station located at State Road 221 and Interstate 10. The County maintains that when plaintiff pulled out of Boothe's service station to cross U.S. 90 she neither had her emergency lights nor sirens turned on. Plaintiff asserts that the emergency lights on the ambulance were flashing. Document 57, attachment 1 at ¶ 6. Both parties agree that before picking up the patient from the Madison Unit, plaintiff was informed by radio that the need to do so no longer existed.

Upon returning to Boothe's service station U.S. 90 was blocked off. There had been a spill of hog entrails and blood on the road. There was also a large semi-truck parked in the parking lot of the Swannee Swifty Store located on U.S. 90. Plaintiff stopped her vehicle and asked the police officer at the scene, Dan Herring ("Herring"), whether he needed help identifying the contents of the spill. Plaintiff then parked her unit and got out of the same and continued to talk to Herring. During the course of the conversation, Herring informed plaintiff that the driver of the semi-truck had told another officer, Craig Norris ["Norris"], that an ambulance had caused the spill when it pulled out in front of him. Plaintiff asserts that she did not see a truck when she pulled out of Boothe's service station. *Id.* Plaintiff maintains that officer Herring did not believe the truck driver and that he, Herring, told her "we'll just write it off." *Id.* After talking to Herring, plaintiff left the spill scene, dropped

---

1. Plaintiff and Botino were sitting in the lobby at the "jail" when Burnett walked over to look at some documents. Plaintiff and Botino were talking about the problems Botino was having setting up the EMS station in Greenville, Florida. The County Commission had allocated a building to be shared by the County Library and EMS. Among other problems with the building set-up, Botino was disturbed that the library was allocated over half of the building space. In the course of the above conversation, plaintiff stated she did not "know why they [the library] needed a ... space as big as the space they had been allotted because ... [plaintiff] did know that many people in Greenville could read." Document 55, plaintiff's deposition, Volume I at 93. Plaintiff asserts that Botino laughed at the comment.

2. Exhibit F provides that Botino advised plaintiff that he had received complaints about things plaintiff had said which had offended "co-work-

ers and citizens." Botino also wrote that plaintiff's "attitude needed an adjustment—2nd time employee has been counseled." *Id.* Plaintiff signed exhibit F acknowledging her "awareness of the content" although not indicating her agreement with the report. *Id.*

3. With respect to this incident, plaintiff asserts that she did not know that smoking at an accident scene was against EMS policy and that once verbally advised by Botino she never did it again. Document 57, attachment 1 at 3. Plaintiff maintains that she has never received a copy of the EMS Policy and Procedures Manual.

4. Plaintiff disputes whether Botino had the authority to extend her probationary period. Document 57, attachment 1 at 3. For one, plaintiff maintains that the County never approved the extension. *Id.*

off the first responder and returned to the Greenville EMS station.

Later that evening Officer Norris went to the EMS station to fill out a report on the spill. Officer Norris asked plaintiff for her driver's license and for insurance information. Plaintiff was not issued a traffic citation. *Id.* ¶ 7. Plaintiff thought Norris needed the information only to document the spill. Despite officer Norris' inquiry, plaintiff did not fill out an EMS incident report and did not talk to her supervisor, Botino, regarding the spill. Plaintiff maintains she did not do so because she did not believe that such type incidents had to be reported. She alleges that she was never told that such incidents had to be reported.

On January 30, 1993, plaintiff's friend, L.J. Epifanio ("Epifanio"), was killed in a traffic accident in Madison County, Florida. The Madison County EMS team responded to the accident scene and immediately began CPR. *Id.* at exhibits J and K. EMS Director Botino was present at the scene and assisted in the CPR of Epifanio. Plaintiff asserts that she was told by a non-county employee, Nathaniel Bland ("Bland"), that CPR had been stopped at the accident scene. Plaintiff asserts that the above was done without prior physician approval. *Id.* at ¶ 8.

On the morning of February 1, 1993, after plaintiff had finished her shift, plaintiff confronted Director Botino in his office as to why CPR had been stopped on L.J. Epifanio. Plaintiff told Botino that she knew that a paramedic was not authorized to stop CPR without prior physician approval. During the course of this conversation plaintiff alleges that Botino became agitated and walked out of the room. *Id.* at ¶ 9. Later that afternoon, Botino called plaintiff and inquired as to the January 28th spill on U.S. 90. Botino accused plaintiff of negligent operation of a vehicle, endangering lives of others, failure to report an accident to her supervisor, and unprofessional conduct at a scene of an accident. *Id.* at exhibit C. The allegations were contained in a letter Botino had drafted. Over the phone, Botino ordered plaintiff to meet him and County Coordinator Cohen Bond ("Bond") in Bond's office the next day.

During the meeting the next day, plaintiff was again questioned concerning the January 28th spill and was shown a letter delivered to EMS from officer Herring regarding the same. Plaintiff subsequently asked to stop the meeting so she could obtain an attorney. Botino explained that plaintiff had to write down her account of the January 28th spill. Plaintiff was then suspended without pay until a written response was received.

On February 8, 1993, plaintiff submitted her written response and requested permission to continue working. This request was denied. Plaintiff's written response did not describe in detail Botino improperly stopping CPR at an accident scene. Plaintiff alleges she was afraid that doing so might lead to some type of County liability. On February 11, 1993, plaintiff requested a hearing on her suspension without pay. *Id.* at exhibit P. A hearing was scheduled for March 10, 1993. *Id.* at exhibit R. On or about February 16, 1993, County Coordinator Bond notified plaintiff by letter that she was fired. Per Bond's letter, the basis of plaintiff's termination was her failure to report the January 28th spill to her supervisor, her past disciplinary history, and her probationary status. *Id.* at exhibit D.

## II. *Procedural Due Process:*

In its supplemental memorandum in support of the motion for summary judgment, the County argues that in light of the Eleventh Circuit *en banc* decision in *McKinney v. Pate,* 20 F.3d 1550 (11th Cir.1994) *cert. denied* —— U.S. ——, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), it is entitled to summary judgment as a matter of law on plaintiff's procedural due process claim. The court in *McKinney* held that in employment termination cases, a public employee is not deprived of procedural due process until the State of Florida, rather than the county, refuses to make available a means to remedy the procedural deprivation. *Id.* at 1563. Even where a plaintiff has shown a procedural deprivation,

> the state may cure ... [that] deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedur-

al deprivation does a constitutional violation actionable under section 1983 arise. *Id.* at 1557. Because the Eleventh Circuit in *McKinney* found that the State of Florida provided sufficient review for procedural due process violations in the employment context via *certiorari* to Florida circuit courts, the County maintains that plaintiff's procedural due process claim should be dismissed as a matter of law.

In her reply to the County's supplemental memorandum, plaintiff consents to voluntarily dismiss her procedural due process claim (count I) against the County in light of the Eleventh Circuit's decision in *McKinney*. Accordingly, the court will not address the issue on summary judgment and count I of plaintiff's complaint is dismissed.

III. *Substantive Due Process:*

■ The County also moves for summary judgment on plaintiff's Fourteenth Amendment substantive due process claim (count II) pursuant to the dictates of *McKinney*. In count II of her complaint, plaintiff alleges that her suspension without pay and subsequent termination was arbitrary and capricious and without rational basis. Document 2, ¶ 52. Plaintiff maintains that the reasons given for her suspension and subsequent termination were pre-textual as the real motivating reason for both actions was her questioning EMS Director Juan Botino about improper resuscitation procedures at an accident scene. *Id.* at ¶ 42.

Until recently, the law of this circuit was that a public employee had a valid cause of action for pre-textual termination under the substantive component of the due process clause. *Narey v. Dean,* 32 F.3d 1521, 1527 (11th Cir.1994) (prior to *McKinney* substantive due process was violated when an employer deprived an employee of a property interest for an improper motive and by means that were pre-textual, arbitrary and capricious). In *McKinney,* however, the Eleventh Circuit held that such a cause of action to be invalid. The court concluded in *McKinney* that because the substantive component of the Due Process Clause protects only those rights that are fundamental, *i.e.,* rights that are implicit in the concept of ordered liberty, a state employee alleging a pre-textual termination does *not* state a substantive due process claim. *McKinney* (citing *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)); *Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994) (dismissing plaintiff's substantive due process claim but allowing plaintiff's First Amendment claim to proceed).

> The substantive component of the Due Process Clause protects those rights that are fundamental, that is, rights that are implicit in the concept of ordered liberty.... Hence, remaining largely outside the scope of substantive due process jurisprudence [is] public employment law.

*Id.* In light of the decision in *McKinney*, the County's motion for summary judgment on plaintiff's substantive due process claim is granted.

IV. *First Amendment:*

■ In count III of the complaint, plaintiff alleges a First Amendment retaliation claim. Plaintiff maintains that she was suspended without pay and subsequently fired from her job as an EMT because she questioned her supervisor, EMS Director Juan Botino, about improper resuscitation procedures at the Epifanio accident scene. Document 2, ¶ 55. The County moves for summary judgment on the basis that plaintiff cannot establish the existence of a genuine issue of material fact as to whether her discharge was the result of an unconstitutional County decision.[5]

■ Before addressing the above issue, it is important to identify the parameters of plaintiff's claim. In this case, plaintiff is suing Madison County, Florida. The law is well established that county liability for damages under Title 42, United States Code, Section 1983, can not attach on the basis of *respondeat superior. See Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98

---

**5.** The County also moves for summary judgment on the basis that plaintiff's comments to her supervisor are not "protected" speech. The court need not decide this issue.

S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). "[A] county may not be held liable solely by virtue of the employment relationship linking it to the offending employee." *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir.1989). Only when the deprivation at issue was undertaken pursuant to county policy or custom does section 1983 liability attach. *Id.* County liability is "limited to acts that are properly speaking, acts of the ... [county]—that is, acts which the ... [county] has officially sanctioned or ordered." *Id.* (quoting *Pembaur v. City Of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986)).

■■ A plaintiff seeking to hold a local governmental unit liable under section 1983, however, is not "limited to decisions made by the ... [local governmental unit's] official legislative body or in written agreements." *Brown v. City Of Fort Lauderdale,* 923 F.2d 1474, 1481 (11th Cir.1991). A plaintiff may also confer liability on a local governmental body, by showing either that the "ultimate decision-making authority acted to deprive the plaintiff of a constitutional right or that the ultimate decision-making authority acquiesced in the deprivation by allowing a custom or practice of such deprivation to exist." [6] *Felton v. Board Of Comm'rs Of The County Of Greene,* 5 F.3d 198, 203 (7th Cir. 1993) (citing *City Of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur,* 475 U.S. at 479–80, 106 S.Ct. at 1298–99).

■■ In order to impose liability under the final policymaker theory of local governmental liability, the challenged action must have been taken pursuant to a·policy adopted by the official or officials responsible under the state law for making policy in that area of the local government's business. *Martinez v. City Of Opa–Locka, Fla.,* 971 F.2d 708, 713 (11th Cir.1992). In this sense, a local governmental unit can be held liable for the single decision of an government official if (1) the official was delegated final policy-making authority with respect to the action

in question or (2) the final policymaker for the local government unit ratified the subordinate official's actions for unconstitutional reasons. *Bannum, Inc. v. City Of Fort Lauderdale,* 901 F.2d 989, 998 (11th Cir.1990) (ratification by the authorized policymakers of a subordinate's reasoning and decision is "chargeable to the municipality because their decision is final"); *Mandel,* 888 F.2d at 791. Accordingly, only those officials whose decisions are *unreviewable* act with the final policymaking authority such that their actions can subject a local government body to section 1983 liability. *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924; *Martinez,* 971 F.2d at 714, 715 (city's charter eliminated the authority of any official or body to review the City Manager's decision to fire an unclassified employee for retaliatory reasons); *Pearson v. Macon–Bibb County Hosp. Auth.,* 952 F.2d 1274, 1281 n. 7 (11th Cir.1992) (a supervisor authorizing the discharge of an employee does not establish policy for the city employer where an appeal to a distinct, higher authority (an appeals commission) is available); *Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 637–38 (11th Cir.1991) (mayor was not the ultimate policymaking authority regarding zoning issues as City Charter gave City Commission power to override Mayor with regard to zoning matters); *Mandel,* 888 F.2d at 792 (in order to rise to the level of final policymaking authority the delegation must be such that the subordinate's discretionary decisions are not subject to review). "[T]he authority to make [county] policy is necessarily the authority to make final policy." *Bannum, Inc.* 901 F.2d at 998 (quoting *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926). "The identification of [final] policymaking officials is a question of state law" for the court to decide. *Praprotnik,* 485 U.S. at 124, 108 S.Ct. at 924–25; *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989).

"Reviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law,

---

6. A custom is defined as a widespread practice that, although not authorized by written law or express county policy, is so permanent and well settled as to constitute a custom or usage with the force of law. In seeking liability from the

County, plaintiff has not alleged that her termination was the product of an unwritten policy or custom. Accordingly, the court will not address this facet of potential county liability.

the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett*, 491 U.S. at 737, 109 S.Ct. at 2724. In addressing the issue, the Supreme Court has cautioned that "a federal court would not be justified in assuming that ... policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126, 108 S.Ct. at 925; *Martinez*, 971 F.2d at 713–14.

From the record evidence before the court it is obvious that neither EMS Director Botino or County Coordinator Bond had final decision-making authority with respect plaintiff's suspension and discharge. For one, although the County Coordinator for defendant County has the power to "[s]uspend, discharge, or remove, any employee", this power is limited to the procedures adopted by the Board. Document 57, attachment 1, exhibit G at 2. Among the procedures adopted by the Board is the Madison County Personnel Policy Manual ("Manual"). The manual specifically provides an employee the right to appeal disciplinary action to a Discipline Review Board ("DRB"). The appeal to the DRB is in the form of an evidentiary hearing and its purpose is to insure that an employee receives an opportunity for an impartial hearing. The DRB hears evidence relevant to the action taken and the employee has the right to be present and ask questions of any witness, and to present any evidence or testimony she may have that is relevant or which may tend to mitigate the discipline imposed. After the hearing has terminated, the DRB goes into a closed session to render their decision. The action of the DRB is *final.* Document 57, attachment 1, exhibit A at 32; Document 55, exhibit B at 32. When disciplinary action is discharge, the Manual provides for a further appeal to the County Commission. *Id.* In this respect, both Botino and Cohen's initial decision to suspend and discharge plaintiff was not insulated from review. *Martinez*, 971 F.2d at 714 (city manager's decision to hire and fire administrative personnel was completely insulated from review by the City Commission).

The record in this case reflects that plaintiff was initially suspended on February 2, 1993, and discharged on February 16, 1993, by County Coordinator Bond. On March 10, 1993 an evidentiary hearing before the DRB was held. At the DRB hearing, plaintiff was represented by counsel and offered evidence that her discharge was the product of her questioning Director Botino about stopping CPR at the Epifanio accident scene without prior physician approval. Defendant on the other hand offered evidence that plaintiff's suspension and discharge were based upon the January 28th spill, her disciplinary history, and her probationary status. By a two-to-one vote the DRB voted to uphold plaintiff's discharge. Document 54 at exhibit S. Plaintiff appealed to the County Commission on April 21, 1993. Plaintiff was again represented by counsel. At the hearing, the Commission heard argument from counsel for both plaintiff and defendant. By a three-to-two vote the County affirmed the dismissal. *Id.*

Given both the County's disciplinary procedure and the operation of the same as to plaintiff, the court finds, as a matter of law, that neither EMS Director Juan Botino or County Coordinator Cohen Bond's decision to suspend and subsequently fire plaintiff was made in the exercise of final policymaking authority. Rather, the final authority concerning plaintiff's discharge laid first with the DRB subject to appeal to the County Commission for defendant County. Thus, in this case, in order for plaintiff to prevail on her First Amendment claim she must establish that the County Commission affirmed her dismissal in violation of her First Amendment right to free speech.

■ It is axiomatic that a public employee may not be discharged in retaliation for protected speech. *Tindal*, 32 F.3d at 1539 (citing *Morgan v. Ford*, 6 F.3d 750, 753–54 (11th Cir.1993)). In order to prevail on her First Amendment claim, plaintiff must establish that (1) her comments to Director Botino addressed a matter of public concern; (2) her First Amendment interest in free speech outweigh the interests of the employer in preserving the efficiency of government

services; and (3) the plaintiff's "speech" was a substantial or motivating factor in the County Commission's decision to affirm the decision of the DRB to discharge her. *Mt. Healthy City Bd. Of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Martinez,* 971 F.2d at 712; *Bryson v. City Of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989). Once plaintiff has established the above *prima facie* case, the burden shifts to the County to prove by a preponderance of the evidence that it would have terminated plaintiff regardless of the protected speech. *Id.*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered ... [when] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party who moves for summary judgment must demonstrate that there are no genuine disputes as to any material facts with respect to issues for which that party bears the burden of proof at trial. As to issues for which the non-moving party bears the burden, the movant need only establish that, after adequate time for discovery, there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). As such, the moving party discharges the initial burden placed by Rule 56 by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Id.*

In determining whether the movant has met these burdens, the court must view the evidence and all permissible factual inferences in a light most favorable to the non-moving party. *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant, for its part, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356; *Samples v. City of Atlanta,* 846 F.2d 1328, 1331 (11th Cir.1988). Rather than merely alleging the existence of some factual dispute, the non-moving party must rebut any facts properly presented by way of affidavits or other evidence demonstrating the existence of a genuine and material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element material to his case so as to create a genuine issue for trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; Fed.R.Civ.P. 56(e). This is not to say that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. *Id.* at 325, 106 S.Ct. at 2553–54. What is needed from the nonmoving party is presentment of evidentiary materials demonstrating that a genuine issue of material fact exists so that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "It follows from these settled principles that if the factual context renders the [nonmoving party's] claim implausible—if the claim is one that simply makes no economic sense—[the nonmoving party] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. If the response to a motion for summary judgment is a mere restatement of conclusory allegations, summary judgment must be entered in favor of the movant. *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982).

■ Among the reasons defendant County moves for summary judgment in this case is that plaintiff cannot present any evidence to support her claim that her comments to EMS Director Botino concerning the improper use of resuscitation procedures at an accident scene played a substantial or motivating role in either the DRB or the County Commission's decision to affirm her dismissal. *Professional Ass'n Of College Educ'rs. v. El Paso County Community College Dist.,* 730 F.2d 258, 265 (5th Cir.1984) ("[i]f a nontenure faculty member is not rehired or is discharged, he must show that his conduct was constitutionally protected and that this conduct was a substantial or motivating factor in the Board's decision not to rehire him") (in-

ternal quotations omitted).[7] In order to create a genuine issue of material fact, plaintiff must, at a minimum, submit some evidence demonstrating that the County Commission based its decision to affirm her dismissal because of her comments to Botino concerning his improper use of resuscitation procedures.

■ Although viewing the facts in light most favorable to the plaintiff it could be argued that Director Botino's recommendation that plaintiff be suspended and discharged was motivated by her comments to him, the record is devoid of any evidence that either the DRB or the County Commission affirmed or ratified her dismissal based on the same. Plaintiff's only evidence of improper motivation by the County Commission is her claim that she did not cause the "accident" underlying her dismissal and that both the DRB and the County Commission affirmed her dismissal without comment. This alone is not sufficient to survive summary judgment. For one, possibility that the County Commission may have erroneously discharged plaintiff, i.e. that she was not responsible for the "accident", does not by its terms implicate that the real reason for her discharge was her protected speech. This court does not stand as a super tribunal to cure incorrect factual decisions surrounding an employee's discharge from her job. The issue this court is empowered to decide is whether the employee's discharge was in violation of the United States Constitution. To this end, plaintiff has provided no record evidence that either the DRB or the County Commission affirmed her discharge for an improper purpose.[8]

Defendant, on the other hand, has submitted evidence that plaintiff's conversation with Botino concerning his improperly stopping CPR at an accident scene was not the basis for the County Commission affirming her discharge. Specifically, defendant has submitted affidavits from Michael Salls, Ronnie Moore, and Clyde King, the three County Commissioners that voted to affirm plaintiff's dismissal, that their "decision to uphold ... [plaintiff's] termination was not based in any manner on her conversation with her supervisor, Juan Botino, on the morning of February 1, 1993, regarding the procedures used and the policies followed by the Madison County EMS in treating L.J. Epifanio following a traffic accident in which he died." Document 55, exhibits A–C. *Fitzpatrick v. City Of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993) (when a movant puts on evidence affirmatively negating a material fact upon which the non-movant bears the burden of proof at trial, the non-movant, for his part, must respond by putting forth supporting evidence sufficient to withstand a directed verdict motion). Given the lack of record evidence to support plaintiff's claim and the County's evidence affirmatively negating plaintiff's claim that the County discharged her in violation of her First Amendment right, plaintiff cannot survive the motion for summary judgment on her First Amendment claim.

Accordingly it is ORDERED:

1. Pursuant to plaintiff's supplemental reply (document 74) Count I of plaintiff's complaint is VOLUNTARILY DISMISSED.

2. Defendant's motion for summary judgment as to Counts II and III of the complaint (document 54) is GRANTED.

---

7. Plaintiff maintains that she is entitled to a *de novo* review by this court concerning her First Amendment claim. Plaintiff is correct. *Holley v. Seminole County School Dist.,* 755 F.2d 1492, 1500–1504 (11th Cir.1985). However, the *de novo* review concerns whether the County Commission, as the final policymaker for the defendant in the area of employee dismissals, affirmed her dismissal in violation of the First Amendment.

8. The only evidence provided by plaintiff remotely connected to any improper motive is an affidavit from Larry Tompkins. Document 57, attachment 3. Mr. Tompkins represents in the affidavit

that during a break of the April 21, 1993, County Commission meeting, he overheard "the County Attorney and two County commissioners" discussing plaintiff's case. The conversation concerned whether plaintiff could afford to carry on with her case if they, the County Commission, affirmed her firing. Mr. Tompkins represents that "one of these people said that they didn't think the Commission would have any trouble with Ms. Bland because she couldn't afford to challenge their decision. When the person who made the remark saw me, they all got quiet and I left the room." *Id.* at ¶ 5.

3.  The clerk shall enter judgment in favor of the defendant and against the plaintiff.

DONE AND ORDERED.